IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

RICKIE BROWN                                                                                            PLAINTIFF

V.                                           CIVIL ACTION NO. 3:14CV201 CWR-LRA

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY                                          DEFENDANT

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Rickie Brown appeals the final decision denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). The Commissioner requests an order pursuant to 42 U.S.C. § 405(g), affirming the final decision of the Administrative Law Judge. Having carefully considered the hearing transcript, the medical records in evidence, and all the applicable law, the undersigned recommends that the decision be affirmed for the reasons that follow.

**Factual and Procedural Background**

Brown filed applications for SSI and DIB, alleging he became disabled on October 1, 2010, at 48 years old, due to a slipped disc, a learning disability, headaches, and chronic pain. Additionally, at the hearing, he also claimed that he suffered from depression, obesity, poor vision, hand pain, and neck and back pain. He is illiterate, with a fifth grade education and has past work experience as a laborer and stocker. Following agency denials of his application, an Administrative Law Judge ("ALJ") rendered an unfavorable decision finding that Plaintiff had not established a disability within the meaning of the Social Security Act. The Appeals Council denied Plaintiff's request for

review. He now appeals that decision.

Upon reviewing the evidence, the ALJ concluded that Plaintiff was not disabled under the Social Security Act. At step one of the five-step sequential evaluation,[1] the ALJ found that Plaintiff had not engaged in substantial gainful activity from his onset date of October 1, 2010. At steps two and three, the ALJ found that although Plaintiff's borderline intellectual functioning was severe, it did not meet or medically equal any listing. At step four, the ALJ found that Plaintiff had the residual functional capacity to perform medium work, except:

> the claimant is illiterate; he can perform simple routine tasks with repetitive work. He should have supervision at a basic level and work with objects more than people. He can be around others.
>
> . . . .
>
> [T]he claimant can lift and carry 25 pounds frequently and 50 pounds occasionally. In addition, he can sit, stand, and/or walk as required by medium work, and pushing and pulling are unlimited except according to the weight restrictions for lifting and carrying.[2]

Based on vocational expert testimony, the ALJ concluded at step five, that given Plaintiff's age, education, work experience, and residual functional capacity, he could perform work as a hand packager, poultry hanger, and kitchen helper.

---

[1] Under C.F.R. § 404.1520, the steps of the sequential evaluation are: (1) Is plaintiff engaged in substantial gainful activity? (2) Does plaintiff have a severe impairment? (3) Does plaintiff's impairment(s) (or combination thereof) meet or equal an impairment listed in 20 C.F.R. Part 404, Sub-part P, Appendix 1? (4) Can plaintiff return to prior relevant work? (5) Is there any work in the national economy that plaintiff can perform? *See also McQueen v. Apfel*, 168 F.3d 152,154 (5th Cir. 1999).

[2] ECF No. 10, pp. 23, 25-26.

**Standard of Review**

Judicial review in social security appeals is limited to two basic inquiries: "(1) whether there is substantial evidence in the record to support the [ALJ's] decision; and (2) whether the decision comports with relevant legal standards." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Carrier v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991)). Evidence is substantial if it is "relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d at 295 (5th Cir. 1992)). This Court may not re-weigh the evidence, try the case *de novo*, or substitute its judgment for that of the ALJ, even if it finds evidence that preponderates against the ALJ's decision. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994).

**Discussion**

Plaintiff argues that the Commissioner's decision should be reversed or alternatively remanded because the ALJ failed to find that his back pain and depression were severe impairments at step two, and failed to find that his borderline intellectual functioning met or equaled Listing 12.05(C) at step three.

In evaluating the severity of Plaintiff's impairments at step two of the sequential analysis, the ALJ cited *Stone v. Heckler,* 752 F.2d 1099 (5th Cir. 1985)*,* in compliance with controlling Fifth Circuit law. *Stone* holds that an impairment is not severe "'only if

3

it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" *Id*. at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir.1984)). In this case, the ALJ found that Plaintiff's borderline intellectual functioning was his only severe impairment, and that neither his depression nor his cervical and lumbar spondylosis were severe. Plaintiff argues that the ALJ's failure to find his cervical spondylosis and depression were severe at step two was not only erroneous, but prejudicial because it directly affected whether he met listing criteria at step three.

The ALJ found Plaintiff's depression was not severe despite a June 2013 hospitalization at Central Mississippi Residential Center for a psychological evaluation after he threatened suicide.[3] He was diagnosed with "Major Depressive Disorder, severe with psychotic features." In support, the ALJ cited the fact that Plaintiff was diagnosed by a nurse practitioner -- an unacceptable medical source under the regulations-- and a lack of treatment, because there were "no other records of admission or evidence of a need for treatment for his depression." The ALJ acknowledges that following this suicide threat, Plaintiff was treated for depression from June 2013-August 2013 at Weems Mental Health Center, where the treating psychiatrist "seemingly adopted the diagnosis of Major

---

[3]He reported to the staff at that facility that he had previously "cut" himself in 2010. ECF No. 10, p. 288.

Depression." But the ALJ also noted that treatment records indicated that Plaintiff's major depression was a single episode, and that he was currently non-psychotic, non-suicidal, non-homicidal, and working at Ability Works. By his last visit, Plaintiff reported that he was doing well and was compliant with his medication. The psychiatrist recommended continued treatment and therapy. It is well settled that if an impairment can be remedied or controlled by medication or therapy, it cannot serve as a basis for a finding of disability. *Lovelace v. Bowen*, 813 F. 2d 55, 59 (5th Cir. 1987). There is substantial evidence to support the ALJ's finding that Plaintiff's depression was not severe.[4]

In finding that Plaintiff's back pain was not severe, the ALJ relied heavily on spinal X-rays showing no abnormalities in the lumbar and cervical spine, and the clinical findings of consultative examiner, Dr. Athar Pasha, who diagnosed Plaintiff, in relevant part, with cervical and lumbar spondylosis, and rule out cervical and lumbosacral radiculitis in May 2012. As to spondylosis, the ALJ noted that the radiologist found that Plaintiff had a normal spine. The ALJ additionally observed that:

> There was no evidence of any degenerative disease and no compression or impingement of the spinal cord to evidence radiculitis. No electromyographs or nerve conduction studies were performed or even suggested, and [Dr. Pasha's] diagnosis was merely a "rule out" diagnosis which seemingly was based solely on the claimant's subjective complaints.[5]

---

[4]ECF No. 10, pp. 19, 282-84, 305-21.

[5]ECF No. 10, p. 19.

The ALJ also noted that during Dr. Pasha's examination, Plaintiff had full strength in all extremities and his gait was not antalgic. The ALJ further stated: "Perhaps the most indicative evidence of the claimant's physical condition is revealed in his ability to perform routine tasks and daily activties. According to the function report, he can cook, make beds, do laundry, shop, watch television, visit with family and friends, and go fishing."[6]

Plaintiff points out that the ALJ's severity analysis does not include a discussion of medical records from Kemper Family Medical Clinic showing his treatment history for back pain in the years prior to Dr. Pasha's consultative examination. However, an ALJ is not required to discuss every piece of evidence, and the ALJ lists these records as among those he considered in reaching his conclusions. There is substantial evidence to support that Plaintiff's back pain was not a severe impairment.

Further, "*Stone* merely reasons that the [severity] regulation cannot be applied to summarily dismiss, without consideration of the remaining steps in the sequential analysis, claims of those whose impairment is more than a slight abnormality." *Loza v. Apfel*, 219 F.3d, 378 391 (quoting *Anthony*, 954 F.2d at 294)(emphasis added). Plaintiff's disability claim was not summarily dismissed at step two here. The ALJ found that Plaintiff's borderline intellectual functioning was severe and proceeded with the sequential analysis. In doing so, the ALJ found that Plaintiff did not meet or equal

---

[6]ECF No. 10, p. 25.

Listing 12.05(C).

To satisfy Listing 12.05(C), Plaintiff must show that his condition satisfies *both* the diagnostic description of mental retardation outlined in the introductory paragraph of 12.05 and the severity criteria enumerated in Subsection C.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05; *Randall v. Astrue*, 570 F.3d 651, 657-59 (5th Cir. 2009).  The diagnostic description defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." *Id.*  Subsection C requires a claimant to show intelligence testing with "a valid verbal, performance, or full scale IQ of 60 though 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id*.  A claimant must prove each condition in order to meet his burden under step three. *Sullivan v. Zebley*, 493 U.S. 521 (1990).

In the present case, the ALJ erred in failing to make any express findings as to whether the claimant had the requisite deficits in adaptive functioning to satisfy the capsule definition of 12.05(C).  However, in determining whether Plaintiff had an impairment that functionally equaled the listings, the ALJ engaged in an extensive analysis of the record evidence in reference to Plaintiff's functional abilities and daily activities.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)*; Arce v. Barnhart*, 185 F.App'x 437, 438 (5th Cir. 2006) (unpublished) (recognizing that the list of activities

of daily living listed in 12.00(C) is relevant to an adaptive functioning analysis under Listing 12.05). The ALJ also acknowledged Plaintiff's communication and intellectual deficits, and incorporated limitations to that effect in his residual functional capacity assessment limiting Plaintiff to simple routine and repetitive tasks. The error was therefore harmless for these reasons, and for the reasons further set forth herein.

The ALJ also found that Plaintiff did not meet 12.05(C) because his verbal I.Q. score of 70 was invalid, *and* he did not have a physical or other mental impairment imposing an additional and significant work-related limitation. In terms of Plaintiff's I.Q. score, which falls within Listing range, the ALJ stated the following reasons for finding the score was invalid:

> The psychologist did not explicitly state the scores were valid and reliable, but perhaps, more importantly, it is unclear whether the scores may have been influenced by the claimant's use of alcohol and/or drugs. According to the report, the claimant was supposed to answer questionnaires concerning drug and alcohol use, and a report on each was to be made an addendum to the report to the psychologist. Nevertheless, these addendums are not attached to the report. The psychologist's diagnosis or impression was that the claimant was in "partial remission" with regard to alcohol abuse. This leaves some question as to how this determination was actually made and whether or not the test scores were in fact, reliable on the day of testing. The claimant's representative argues that the examiner noted the claimant "appeared to do his best." Nevertheless, given the ultimate impressions, this statement cannot be determinative. It certainly leaves one to question whether or not the claimant's best efforts under these circumstances included recent alcohol and/or drug use. It is difficult to determine the basis for the psychologist's diagnosis without further information, and it leaves the circumstances on the day of testing, questionable at the least. According to the report, the examiner was Robin Petty whose credentials are not listed. It appears that the referral and background information were not completed by the psychologist because

> there are statements saying the results of the alcohol questionnaire and drug questionnaire were "Being forwarded to the Psychologist and will follow as an addendum to this report." Consequently, a reasonable conclusion would be that the examiner was likely the reporter and not the psychologist, and that the psychologist was not present at the time of testing. Even assuming that the examiner was qualified to administer the test, the other questions of validity and reliability remain. The diagnosis rendered by the psychologist, Jerry Rowzee, Ph.D. was borderline intellectual functioning, and he only gave a diagnosis of intellectual disability by history. He also recommended the claimant pursue narcotics anonymous and/or alcoholics anonymous, and he recommended that the claimant's recovery progress for drugs and/or alcohol be monitored. This is further reason to question the validity and reliability of the test on the day in question.[7]

Plaintiff argues that the ALJ's analysis is flawed. The Court agrees, but finds any error in this regard was not prejudicial.

When analyzing whether a claimant meets the I.Q. requirements of Listing 12.05(C), an "ALJ may make factual determinations on the validity of I.Q. tests." *Muse v. Sullivan,* 925 F.2d 785, 790 (5th Cir. 1991) (affirming where ALJ found I.Q. test invalid because claimant did not wear eyeglasses and had trouble seeing during the examination and because of claimant's education, work experience, and demeanor at the hearing called into question any I.Q. result indicating retardation). "However, because ALJ's are not physicians, they may not hastily reject I.Q. scores." *Carr v. Astrue*, No. 1:06cv318-SA-DAS, 2008 WL 4326344 (N.D. Miss. Sept.22, 2008) (citing *Gonzalez v. Barnhart,* No. SA-05-CA-0282-4F, 2006 WL 1875912, at * 5 (W.D. Tex. June 30, 2006) ("[T]he evaluation of mental functioning and depression requires specialized training. If

---

[7]ECF No. 10, pp. 21-22.

an ALJ discounts the diagnoses and opinions from specialists in the field without specific and legitimate reasons for rejecting them, he or she impermissibly substitutes a layman's view of a disorder in lieu of an expert opinion."). An ALJ may discount an IQ score as invalid so long as there is substantial evidence in the record to support his conclusion. *Muse*, 925 F.2d 789-90.

Here, there is no opinion from Dr. Rowzee or any other mental health professional suggesting Plaintiff's I.Q. scores were affected by drug or alcohol abuse, and not his borderline intelligence. Nor is there is an opinion from any medical source finding the I.Q. scores were invalid. *See Cammon v. Astrue,* No. CIV.A.3:08–CV–0131-JFK, 2009 WL 3245458, *10 (N.D. Ga. Oct. 5, 2009) ("While the ALJ correctly noted that Dr. Maierhofer did not specifically state that the IQ scores were valid, he also did not state that the scores were invalid."). On the contrary, the examiner indicated that Plaintiff was cooperative and appeared to apply his best effort, specifically, noting that Plaintiff was "attentive, followed instructions, and appeared to do his best." She also noted that "no problems or interruptions were encountered during the evaluation, which went according to standardization procedures." Although the ALJ highlights the fact that the examiner was Robin Petty, the report is signed by Dr. Rowzee. The Court notes that it was not unreasonable for the ALJ to question the examiner's "diagnostic impression" that Plaintiff's alcohol abuse was in partial remission, particularly given that no explanation is provided for this statement and the questionnaires were not included in the record. But as

Plaintiff argues, it is a leap to conclude that Plaintiff may have been under the influence during the examination absent any evidence to that effect. The ALJ's assertions are pure speculation based on Plaintiff's history of drug and alcohol abuse. The mere possibility that a claimant is abusing alcohol, or has a history of drug and alcohol abuse, does not necessarily invalidate a claimant's I.Q. scores.[8]

The ALJ's errors in assessing Listing 12.05(C) are reversible only if prejudicial. The ALJ found that Plaintiff did not meet 12.05(C) because he did not have a valid I.Q. score *and* a physical or other mental impairment imposing an additional and significant work-related limitation. Specifically, the ALJ found that the objective medical evidence showed Plaintiff's "physical examinations were relatively normal," and "his depression was only one acute instance for which he was treated." Based on the evidence, the ALJ found that Plaintiff has the residual functional capacity to perform medium work, citing a lack of objective evidence, and Plaintiff's ability to perform routine tasks and daily activities, including household chores, fishing, and visiting friends and family.[9]

However, Plaintiff argues that the ALJ's residual functional capacity assessment limiting him to medium work is inconsistent with his findings that he did not have a severe physical impairment at step two, or a significant work-related limitation at step three. Such inconsistency, according to Plaintiff, significantly undermines the ALJ's

---

[8]ECF No. 10, pp. 282-84.

[9]ECF No. 10, p. 22.

11

finding that Plaintiff's physical impairment did not meet *Stone's de minimis* standard of severity at step two.  The Commissioner counters that the ALJ was simply giving Plaintiff the benefit of the doubt by crediting his subjective complaints of pain as he is required to do.  To that end, the ALJ offers the following explanation:

> The undersigned, however, has taken into account the perception of [Plaintiff's] own pain, and while the objective evidence does not support a claim of disability, his perception of pain and side effects of medication for pain are consistent with the impairments in supporting a reduced capacity for work-related activity.  In light of these considerations, the undersigned finds that he is capable of performing medium exertional activity as more particularly described in the above residual functional capacity.[10]

The Court finds these comments adequately explain the ALJ's residual functional capacity assessment and decision to limit Plaintiff to medium work.  Further, although the ALJ erred in both failing to make express findings with regard to adaptive functioning, and in assessing Plaintiff's I.Q. scores, Plaintiff was not prejudiced by these errors.  Substantial evidence supports the ALJ's finding that Plaintiff did not have an additional significant work-related limitation to meet Listing 12.05(C), which is consistent with the ALJ's finding that neither his depression or back pain were severe at step two.

For these reasons, it is the opinion of the undersigned United States Magistrate Judge that Defendant's Motion to Affirm the Commissioner's Decision be granted; that Plaintiff's appeal be dismissed with prejudice; and, that Final Judgment in favor of the Commissioner be entered.

---

[10] ECF No. 10, p. 25.

**NOTICE OF RIGHT TO APPEAL/OBJECT**

Pursuant to Rule 72(a)(3) of the Local Uniform Civil Rules of the United States District Courts for the Northern District of Mississippi and the Southern District of Mississippi, any party within 14 days after being served with a copy of this Report and Recommendation, may serve and file written objections. Within 7 days of the service of the objection, the opposing party must either serve and file a response or notify the District Judge that he or she does not intend to respond to the objection.

The parties are hereby notified that failure to file timely written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. 28 U.S.C. § 636, Fed. R. Civ. P. 72(b) (as amended, effective December 1, 2009); Douglas v. United Services Automobile Association, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

This the 31st day of August 2015.

                                                    /s/ Linda R. Anderson
                                      UNITED STATES MAGISTRATE JUDGE